## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ITL INTERNATIONAL, INC., d/b/a | § | |
| MARS CARIBBEAN AND CENTRAL | § | |
| AMERICA, f/k/a MASTER FOODS | § | |
| INTERAMERICA, and MARS, INC. | § | **PLAINTIFFS** |
| | § | |
| v. | § | **CAUSE NO. 1:10CV477 LG-RHW** |
| | § | |
| CAFÉ SOLUBLE, S.A. | § | **DEFENDANT** |

## MEMORANDUM OPINION AND ORDER
## GRANTING MOTION TO DISMISS

BEFORE THE COURT is the Motion [5] to Dismiss pursuant to Rule 12(b)(2), (3), (4), and (5), and the Motion [7] to Dismiss for Forum Non Conveniens, filed by Defendant Café Soluble. The issues have been fully briefed by the parties and duly considered by the Court. The Rule 12 Motion is granted and the Forum Non Conveniens Motion is denied.

### FACTS AND PROCEDURAL HISTORY

In this action, the Plaintiffs, referred to as "Mars," invoke the Court's diversity and federal question jurisdiction. Mars seeks declaratory and injunctive relief preventing Café Soluble from importing, distributing or affiliating itself with Mars products, or seeking relief from a Nicaraguan court, after their contractual relationship ends. According to the allegations of the First Amended Complaint, Plaintiffs, Mars Corporation and its subsidiary ITL International, are Delaware corporations with their principal places of business in Virginia. Mars Corporation was qualified to do business in Mississippi prior to filing this suit. ITL International has since qualified. Accordingly, both are also residents of Mississippi.

Defendant Café Soluble, S.A. is a Republic of Nicaragua corporation with its principal place of business in Nicaragua.

The Plaintiffs sell their products to Café Soluble for importation and distribution in Nicaragua. They allege that Café Soluble chose the port at Gulfport, Mississippi to receive title and possession of the goods, which were then shipped to Nicaragua via Puerto Rico. Café Soluble's purchases are made pursuant to the parties' Importer Agreement, entered into on July 1, 1994 and renewable every year. Mars alleges that the Importer Agreement will not be renewed in July 2011, and it has notified Café Soluble that the Agreement will be terminated.

Mars alleges it attempted to get Café Soluble representatives to go to Mars' offices in Puerto Rico to discuss a continuation of their importation arrangement, but Café Soluble did not comply. Mars further alleges that Café Soluble claims it retains the exclusive right to buy Mars products in the United States for import to Nicaragua regardless of whether the Importer Agreement is renewed. Broadly, Mars seeks 1) to prevent Café Soluble from claiming an affiliation or connection to Mars after July 1, 2011, 2) a declaration that Mars is not liable to Café Soluble for withdrawing its permission to purchase Mars products or use Mars' Marks, and 3) a declaration that Mars may sell its products to others for distribution in Nicaragua. *See* Am. Compl. ¶28-36.

Café Soluble seeks dismissal on a number of grounds. Because the Court finds that exercising jurisdiction over Café Soluble would violate due process, the motion for dismissal for lack of personal jurisdiction pursuant to FED. R. CIV. P. 12(b)(2) will be

granted as to the contract claims and that portion of the case dismissed with prejudice. The Court lacks subject matter jurisdiction of the false representation and trademark claims. They will be dismissed without prejudice. The Forum Non Conveniens motion will be denied because the Court lacks jurisdiction to consider it.

DISCUSSION

This case is nearly identical to *ITL International, Inc., et al. v. Grupo Constenla, S.A.*, Cause No. 1:10cv467 LG-RHW (S.D. Miss. Sept. 24, 2010), in a number of important respects. The plaintiffs and their claims are the same. The only relevant difference is that in the *Constenla* case the distribution of Mars products was accomplished in Costa Rica by a Costa Rican company. Any differences between the two importation/distribution agreements are not relevant to the determination of personal jurisdiction. Both Costa Rica and Nicaragua had laws in place providing for a termination, severance or penalty payment in the event a foreign manufacturer terminated its relationship with the local distributor. In both cases, Mars wishes to avoid application of or liability under these laws. Mars has separated its claims in this case into two general categories - contract claims and false representation and trademark claims.

The Contract Claims - Café Soluble's Contacts:

In *Constenla*, this Court determined that Mars had established that the distributor had minimum contacts with the State of Mississippi, but it would not be fair or reasonable for the Court to assert jurisdiction over the distributor. *ITL Int'l, Inc. v. Constenla, S.A.*, No. 1:10cv467 LG-RHW, 2010 WL 4537931, at *6-7 (S.D. Miss.

Nov. 2, 2010) ("*Constenla*").  The minimum contacts essentially were the distributor's

affirmative action of specifying delivery of Mars products in Mississippi, where title

and possession transferred prior to shipment to Costa Rica.

Café Soluble argues that it does not specify the Gulfport, Mississippi, port for

delivery of Mars products; that Mars or its shipper makes the decision of which port

to use.  According to Café Soluble's Distribution Manager,

> MFI contracts with a shipper to transport Mars products from the Mars
> factory or warehouse to port.  Because of MFI's enhanced leverage and
> bargaining power, it identifies shippers it trusts and who meet its high
> standards and negotiates with them favorable rates.  Between 2008 and
> 2010, MFI contracted with either Maersk or Great White Fleet as its
> shipper.  Café Soluble used Mars' contracted shipper for the transport of
> the Mars products from port to Nicaragua.  The ports that were used
> included Miami, Norfolk, Savannah, Gulfport and Lazaro Cardenas,
> Michoacan, Mexico.  Whether Mars or Mars' contracted shipper was
> responsible for selecting the port, the fact is that Café Soluble did not
> choose the port and specifically did not choose Gulfport as a port.

Def. Reply Ex. 2 (¶3), ECF No. 19-2.

In contrast, Mars' Customer Business Development Director for Central America
and the Caribbean region states:

> Doing business with Mars in Gulfport, Mississippi, was Café Soluble's
> free choice made for Café Soluble's own economic and business reasons.
> It is Mars' policy with buyers generally, and its specific practice with Café
> Soluble, never to require the customer or buyer to take FOB delivery in
> a particular port or to impose or dictate that decision. . . . Mars never
> imposed Mars' choice of shipper on Café Soluble, or barred Café Soluble
> from using whatever shipper Café Soluble wanted to use.

Pl. Resp. Ex. 1 (¶¶ 7,8), ECF No. 15-1.

The Court cannot resolve this factual dispute, but must credit the assertions of

Mars - the party attempting to establish jurisdiction.  *Bullion v. Gillespie, M.D.*, 895

F.2d 213, 216-17 (5th Cir. 1990).  Thus, the jurisdictional facts are similar enough to

-4-

those in the *Constenla* case that the outcome should be the same.  The analysis of the Mississippi long arm statute and due process minimum contacts set out in *Constenla* is adopted and incorporated into this opinion.  For the same reasons as those set out in *Constenla*, the Court finds sufficient contacts with Mississippi by Café Soluble to satisfy both the Mississippi long arm statute and the minimum contacts requirement of the due process inquiry.

<u>"Fair and Reasonable"</u>

The exercise of jurisdiction must be reasonable in light of the circumstances. *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872 (5th Cir. 2000).  Where a defendant has purposefully directed its activities at the forum state's residents, it must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

In the *Constenla* case, the Court focused on the fairness and reasonableness of trying the case within the United States, and particularly, in Mississippi.  The parties' relationship was centered in Costa Rica, the terms of their relationship required the application (or at least consideration) of Costa Rican law, and there was a significant risk that Costa Rican courts would claim exclusive jurisdiction of the dispute and therefore disregard any order entered by this Court.  This case presents the same issues concerning the application of foreign law and public policy.  Café Soluble contends that it would be unfair and unreasonable for this Court to exercise jurisdiction over this dispute.  Mars, as an American corporation, naturally prefers to have the case decided by the United States courts and according to United States law.

-5-

The parties have submitted affidavits from Nicaraguan lawyers supporting their arguments.

**_Declaration of Salvador Perez_** - _for Mars_:

Perez states that Nicaraguan law (Decree No. 13) concerning manufacturer/distributor termination payments would not apply to this case because "the circumstances of this case are not of the type that interest Nicaraguan law and policy." Ex. 4, ECF No. 15-4 p. 3. According to Perez, the law applies in cases where the distributor wishes to continue distributing for the manufacturer and the manufacturer refuses. He believes this case presents the opposite scenario - that Mars wanted to continue selling products to Café Soluble, but Café Soluble refused. *Id.*

The allegations of the First Amended Complaint are incompatible with Perez's characterization. Mars alleges in a number of ways that it wishes to be free from its contractual responsibilities to Café Soluble. For example, its "Contract Claims" section begins with the assertion that "MFI is free, effective immediately, not to sell its products to Café Soluble" and that Mars should not be liable for any damages for its failure to sell products to Café Soluble. Am. Compl. ¶¶44-45. Obviously, if the parties have a justiciable dispute, it is because Café Soluble takes the opposite position. Mars also explicitly states it "denies having any obligation to sell to the Defendant . . . while the Defendant maintains that MFI has such obligations." Am. Compl. ¶ 60.

Perez also states that the Law does not apply unless there has been a unilateral termination by the manufacturer. Ex. 4, ECF No. 15-4 p. 3. According to the First Amended Complaint, Mars did unilaterally terminate the Importer Agreement. Mars

alleges it terminated Café Soluble's rights under the Importer Agreement by giving the required three months notice on October 15, 2010. Am. Compl. ¶ 41. It provided notice of termination by delivering a copy of the original complaint filed in this case. *Id.* As Perez's conclusions regarding the application of Nicaraguan Decree No. 13 are based on an improper characterization of the case, the Court will not rely on them.

***Declaration of Ana Teresa Rizo*** - for Café Soluble:

Rizo states that Decree No. 13 is protective of a Nicaraguan distributor that enters into a distribution relationship with a foreign supplier. Ex. B ¶5, ECF No. 6-3 p. 3. The supplier may unilaterally terminate the relationship without penalty if it does so for legal cause as defined in the Law. If the supplier unilaterally terminates, modifies or refuses to renew an agreement without cause, the local distributor is entitled to compensation. *Id.* at ¶8. The amount of the compensation may be agreed to by the parties or determined judicially. *Id.* at ¶9. Decree No. 13 imposes additional conditions on the terminating supplier. *Id.* at ¶10-12.

The Law provides that local, Nicaraguan, courts have exclusive jurisdiction over actions related to the relationship between the supplier and the distributor, and such an action is subject to Nicaraguan laws, even if the parties have agreed otherwise. *Id.* at ¶ 13. Decree No. 13 was in effect at the time Café Soluble and Mars entered into their Importer Agreement, therefore their relationship is subject to the Law. *Id.* at ¶14. Nicaraguan courts will enforce a United States court's judgment only if an "exaquatur" is obtained, and an exequatur would not issue if Decree No. 13 was not applied under the facts of this case. *Id.* at ¶18-20. Further, Nicaraguan law protects

duly registered trademarks.  Accordingly, Mars' trademark claims could be brought in Nicaragua.  *Id*. at ¶21.

The parties have also provided declarations describing the business relationship.

***Declaration of Guillermo Gonzales*** - for Mars:

Gonzales is the Customer Business Development Director at Mars Caribbean & Central America.  Ex. 1 (¶1), ECF No. 15-1.  He manages a Mars office in Panama City, Panama.  There is no Mars office in Nicaragua.

Gonzales states that for the period between 2008 and 2010, Café Soluble made 51 purchase orders to take title and possession of Mars products at one of six ports in the United States.[1]  Twelve of those orders called for delivery to the Gulfport, Mississippi, port.

Gonzales does not describe how the Importer Agreement came into being, but he acknowledges its authenticity.  He states that Mars filed this lawsuit prior to discussing its intentions with Café Soluble, because it "wanted a judgment in this Court resolving the question whether by selling directly to Walmart, Mars would be liable to pay a termination penalty under Nicaraguan Decree No. 13 as Café Soluble claims."  *Id*., ¶13.  After the complaint was filed, Gonzales contacted Café Soluble's Distribution Manager, Armando Castillo, and "invited him to meet with Mars executives to agree to continue our relationship indefinitely on the same non-exclusive basis that we have always had."  *Id*., ¶14.  Café Soluble declined a meeting, stating

---

[1]  Café Soluble also specified delivery to two ports in Mexico.

that they intended to continue the business relationship as it existed under the Importer Agreement, which they considered to be in full force and effect.  *Id.*, ¶16. From October through December 2010, Café Soluble declined Mars' invitations to meet. Gonzales concludes his declaration by stating:

> Café Soluble's refusals to sit down with us and discuss Mars' concerns and continued business together made clear that it was not interested in being responsive to Mars or working for Mars.  I concluded that what Café Soluble wants is not to work for Mars and to receive a payment under Nicaraguan Decree No. 13.  As a result it was decided, with the advice of Nicaraguan and U.S. counsel, not to renew the contract that automatically ends on July 1, 2011 unless renewed, and to give notice of termination.

*Id.*, ¶ 23.

### *Declaration of Armando Castillo* - for Café Soluble:

Armando Castillo is Café Soluble's Distribution Manager.  He, and all of Café Soluble's employees, are based in Nicaragua.  He states that a Mars representative traveled to Nicaragua in 1994 and negotiated the Importer Agreement with Café Soluble.  Ex. A ¶7, ECF No. 6-1.  Since 1994, Café Soluble has been Mars' exclusive distributor in Nicaragua, with the exception that Mars has sold directly to Pricemart since Pricemart began operations in Nicaragua in 2003.  Café Soluble distributes Mars products only in Nicaragua.  Café Soluble has no employees, property or operations in the United States.

Café Soluble sent monthly purchase orders to Mars in Puerto Rico and paid invoices by wire transfer to a Puerto Rican bank account.  Mars and Café Soluble worked together on joint promotions, product launches, sales activities and programs

in Nicaragua. Mars has conducted training for Café Soluble in Nicaragua and, on two or three occasions, in Puerto Rico. When Mars and Café Soluble meet to discuss the Importer Agreement, the meetings are in Nicaragua or, on a few occasions, other locations in Central America.

At an October 2009 meeting in Guatemala, a Mars employee told Castillo that Mars wanted to make changes to the agreement with Café Soluble in the future. Castillo heard nothing further until the phone call referenced above by Guillermo Gonzalez, when Castillo was informed that a lawsuit had been filed in order to renegotiate better terms for Mars in a new contract. Mars cancelled Café Soluble's September 2010 orders and did not ship any more Mars products to Café Soluble. Castillo states that Mars has not provided Café Soluble with three months prior written notice of termination of the Importation Agreement.

From these affidavits, it appears to the Court that it would be unfair and unreasonable to assert jurisdiction over Café Soluble for the reasons set out in *Constenla*. The interests of Mars and the state of Mississippi are insubstantial compared to the strong interests of Nicaragua. The declaratory judgment sought by Mars concerns activities of persons and organizations in Nicaragua and would require the cooperation of Nicaraguan courts to enforce. The declaration of Rizo, which the Court considers to be  undisputed by Mars, shows that the prospects of this Court's judgment being enforced in Nicaragua would be slight. Furthermore, except for the origin of the distribution chain, almost all aspects of the parties relationship takes place in Nicaragua. The participants, especially the other persons and entities

Plaintiffs seek to enjoin, are primarily Nicaraguan.  Mars does not point to any witnesses or evidence in Mississippi.  The merits of the case involve Nicaraguan distributorship laws.  In all, these factors favor dismissal of the contract claims rather than the Court's assertion of jurisdiction over Café Soluble.

The False Representation and Trademark Claims:

Mars argues that the Court has personal jurisdiction over Café Soluble under FED. R. CIV. P. 4(k)(2), which "authorizes the exercise of territorial jurisdiction over the person of any defendant against whom is made a claim arising under federal law if that person is subject to personal jurisdiction in no state." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 n.23 (11th Cir. 2009).  The rule requires that "exercising jurisdiction is consistent with the United States Constitution and laws." FED. R. CIV. P. 4(k)(2)(B).  Mars contends that the Court has jurisdiction of the false representation and trademark claims under this rule, as Mars' trademarks are protected by the Lanham Act, 15 U.S.C. § 1051, *et seq.*  Rather than decide the personal jurisdiction arguments presented, the Court finds it necessary to examine its subject matter jurisdiction regarding these claims.

Mars alleges in its Amended Complaint that Café Soluble only has the right to use its marks by virtue of the Importer Agreement, and Café Soluble's right to use the marks will terminate along with the Agreement.  Am. Compl. ¶¶54, 55.  Mars seeks a declaration that Café Soluble has no right to use the Mars marks after termination of the Agreement, and an injunction preventing Café Soluble from using the marks.

In the Court's view, the claims related to Mars' marks do not present a

justiciable controversy.

> In the declaratory judgement context, whether a particular dispute is ripe for adjudication turns on whether a substantial controversy of sufficient immediacy and reality exists between parties having adverse legal interests.

*Venator Grp. Specialty, Inc. v. Matthew/Muniot Family, LLC*, 322 F.3d 835, 838 -839 (5th Cir. 2003) (citations omitted). *See also Rowan Cos., Inc. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989) ("A controversy, to be justiciable, must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop."). "Ripeness is a constitutional prerequisite to the exercise of jurisdiction." *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002). This applies to both the injunctive and declaratory relief requested by Mars. *Int'l Tape Mfrs. Assn. v. Gerstein*, 494 F.2d 25, 27 (5th Cir. 1974).

Mars' trademark-related claims are based only on the possibility that, in the future, Café Soluble will use Mars' marks in a way that is either a misrepresentation or a violation of the Lanham Act. Café Soluble is presently authorized to use the Mars marks. Whether it will misuse them in the future is conjectural. There is no allegation that Café Soluble has unauthorizedly used Mars marks, has plans to do so, or otherwise intends to do so. *See* Am. Compl. ¶¶ 59-64. Similarly, there is no evidence showing that Café Soluble has taken or intends to take any unauthorized actions regarding Mars' marks.

Mars' trademark claims concern actions that have not been shown to be likely to occur. *See Venator*, 322 F.3d at 840. The claims are completely hypothetical at this

time and therefore inappropriate for declaratory or injunctive relief. *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000). "A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical." *Id.* at 895 (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586-87 (5th Cir. 1987)). Accordingly, Mars' false representation and trademark claims will be dismissed without prejudice for lack of subject matter jurisdiction. The Plaintiffs will be granted time within which to amend these claims.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion [5] to Dismiss filed by Defendant Café Soluble, is **GRANTED**. The Plaintiffs' false representation and trademark claims are **DISMISSED** without prejudice. The remainder of Plaintiffs' claims are **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Motion [7] to Dismiss for Forum Non Conveniens, filed by Defendant Café Soluble, is **DENIED** for lack of jurisdiction.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Plaintiffs may file an amended complaint within twenty (20) days of the date of this Order.

**SO ORDERED AND ADJUDGED** this the 18th day of April, 2011.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE